**ORDERED.**

Dated: **March 15, 2024**

Jason A. Burgess
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

In re:

Armin Ebrahimpour,

    Debtor.
_____/

Armin Litigation, LLC
a Florida Limited Liability Company,

    Plaintiff,

v.

Armin Ebrahimpour,

    Defendant.
_____/

Case No. 8:19-bk-04182-BAJ
Chapter 7

Adv. No. 8:19-ap-00309-BAJ

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Proceeding came before the Court for trial on July 31, 2023, on the complaint to determine the dischargeability of a $6 million judgment (the "Judgment") pursuant to 11 U.S.C. § 523(a)(4) and § 523(a)(6), filed by Benz Research and Development, Corporation ("Benz Research"),[1] against Armin Ebrahimpour (the "Debtor").

---

[1] The claim in this Proceeding has been assigned to Armin Litigation, LLC ("Armin"), and Armin has been substituted as the Plaintiff in this action. See Order Granting Plaintiff's Motion to Substitute Party (Doc. 125).

The origin of the parties' dispute arises from the Debtor's misappropriation of trade secrets from Benz Research, his former employer. A very lengthy and contested state court battle ensued which culminated in the Judgment.[2] In this Proceeding, Benz Research initially moved for summary judgment based on the theory of collateral estoppel. The court,[3] however, in denying summary judgment found that although the Debtor was "collaterally estopped from relitigating the fact that he misappropriated Benz Research's trade secrets and later engaged in litigation misconduct Benz Research [was] not entitled to judgment as a matter of law."[4] Therefore, pursuant to the "law of the case," the matters before the Court for its determination are "whether the Debtor (1) took Benz Research's trade secrets with the intent to convert them or deprive Benz Research of them; or (2) intended to injure Benz Research by misappropriating its trade secrets or engaging in litigation misconduct."[5]

The matters in this Proceeding present extremely complex intellectual property issues, with various layers of intricacies. Compounding the complexity of the legal issues involved, the parties also have a long and contentious history. Despite this, counsel for both parties remained very professional and conducted themselves with decorum throughout the course of the 4-day trial. The Court commends the attorneys and encourages future parties appearing

---

[2] As previously recognized by the Court, "fees make up more than 98% of Benz Research's final judgment against the Debtor." (Doc. 57, p. 6).

[3] The main bankruptcy case and this Proceeding were handled by Judge Williamson until his passing in November of 2022, at which time the matter was reassigned to me. Judge Williamson's meticulously crafted "Memorandum Opinion On Dischargeability of Trade Secrets Claim as a Matter of Law" (the "Memorandum Opinion") is the law of the case. (Doc. 57).

[4] Id. at p. 2.

[5] Id.

before the Court to remember that it is in the best interest of all those involved to maintain a respectful and professional approach.[6]

For the reasons set forth herein, the Court finds that the weight of the evidence supports a finding that the Judgment debt owed by the Debtor to Benz Research is not dischargeable pursuant to 11 U.S.C. § 523(a)(4) and § 523(a)(6).

## Findings of Fact[7]

On November 7, 2002, the Debtor, who holds a Bachelor of Science degree in mechanical engineering, entered into an employment agreement with Benz Research, a company that manufactures custom cut, lathed contact lenses.[8] The Debtor was hired as a mechanical design engineer and was responsible for creating new machinery and manufacturing processes.[9]

During his employment, the Debtor used SolidWorks 3D design software to create three-dimensional models for the components of Benz Research's Integrated Lens Manufacturing system ("ILM").[10] The components of the ILM allow Benz Research to manufacture contacts lenses with a high degree of precision, and include a customized base and front curve mandrels, static collect assemblies, a pneumatic wax dispenser, and a portable tabletop waxer.[11] The Debtor testified that these models were confidential and propriety to Benz Research, were entrusted to him solely for the benefit of Benz Research, and that he was

---

[6] As stated by the Court at the conclusion of the trial, "[w]e've got good attorneys on both sides, it makes it a lot easier. Especially in an emotional case that's been around for so long, and has went through so many different stages." (Doc. 172-4, Tr. p. 229).

[7] The "Undisputed Facts" in the Memorandum Opinion are incorporated into these Findings of Fact.

[8] (Doc. 146, p. 2), (Doc. 172-1, Tr. p. 19).

[9] (Doc. 172-1, Tr. pp. 17-19).

[10] (Doc. 172-1, Tr. pp. 247-249, 258).

[11] (Doc. 172-1, Tr. pp. 121-125, 135, 175-176, 225-27).

aware of the obligation to return the models on or before the last day of his employment with the company.[12] The Debtor also acknowledged throughout his testimony that Benz Research implemented various layers of security, which included magnetic access cards and restricted access to the engineering department.[13]

Notably, in June of 2010, the Debtor requested and read a copy of his initial employment agreement, which defines confidential information and uses the term "trade secrets."[14] Throughout the trial, the Debtor was evasive about his understanding of the nondisclosure provision in his Employment Agreement, as well as his general understanding of what encompassed confidential information.[15] The Court found the Debtor's testimony on this subject *not* credible, as it defies logic that someone with the Debtor's intelligence, educational background, and work history did not have a sufficient understanding of the term.

For more than eight years, the Debtor maintained full time employment with Benz Research until his last day on February 28, 2011.[16] Prior to the Debtor tendering his letter of resignation, he accepted an employment offer on February 8, 2011 with Mark' Ennovy Personalized Care S.L. ("Ennovy"), a lathed contact lens manufacturer based in Spain, and began working for the company on March 1, 2011.[17] Prior to accepting the position at Ennovy, the Debtor traveled to Europe twice, during which time he met with Ennovy executives, and toured Ennovy's factory in Madrid. On his first recruitment trip in January 2011, the Debtor

---

[12] (Doc. 172-1, Tr. pp. 47-49, 260-264, 272; Doc. 172-3, Tr. pp. 25-26, 36-37, 46; Doc. 172-4, Tr. pp. 154-158).

[13] (Doc. 172-1, Tr. pp. 100-106).

[14] (Doc. 172-1, Tr. pp. 44-46).

[15] (Doc. 172-1, Tr. pp. 26-31; 47-53).

[16] The Debtor tendered his letter of resignation on February 15, 2011, and his last day of employment was on February 28, 2011. (Pl.'s Ex. 13).

[17] (Doc. 172-2, Tr. pp. 100-101).

was informed by Ennovy executives of the company's lathing problems, high rejection rates, and need for process improvement.[18] Specifically, the Debtor testified that he realized that Ennovy's system was outdated because the industry had already begun to move to base curve mandrels which were an improvement over Ennovy's blank to collet system.[19] Following the Debtor's first recruitment trip, he received an offer letter from Ennovy on January 10, 2011.[20]

On the Debtor's second trip in February 2011, he observed the problems with Ennovy's blank to collet system.[21] The Debtor characterized the high rejection rate as a "desperate production situation," and acknowledged that Ennovy "needed an overhaul of their manufacturing process just to keep up with the demand."[22] Therefore, when the Debtor submitted his February 15, 2011 notice of resignation to Benz Research, he was aware that his expertise and knowledge with respect to improving lathing operations would be his primary focus at Ennovy.[23]

On March 1, 2011, the Debtor became an Ennovy employee, and began work on March 10, 2011, in Spain. Upon commencing employment, the Debtor brought to Ennovy base and front curve mandrels from Benz Research, a CD-ROM with Benz Research's SolidWorks models for its front and base curve mandrels, pneumatic and tabletop wax dispensers, and static collet assembly.[24] The Debtor copied these design models from Benz Research's computers

---

[18] (Doc. 172-1, Tr. pp. 333-341).

[19] (Doc. 172-1, Tr. pp. 193, 200-214, 311, 354-373; Doc. 172-2, Tr. p. 11).

[20] (Pl.'s Ex. 12).

[21] (Doc. 172-1, Tr. pp. 193, 201-214, 311, 354-373).

[22] (Doc. 172-2, Tr. pp. 102-103, 106).

[23] (Pl.'s Ex. 13); (Doc. 172-1, Tr. pp. 304-307, 310-311; Doc. 172-4 pp. 25-26; 27-28).

[24] (Doc. 172-1, Tr. pp. 278-283; Doc. 172-2 pp. 96-97; Doc. 172-4 p. 143).

without its knowledge or consent, and subsequently transferred the models to his Ennovy laptop computer from which the files were later uploaded to Ennovy's server.[25]

Merely one week after beginning his position with Ennovy,[26] as well as multiple times thereafter, the Debtor proposed that Ennovy replace its outdated blank to collet system with base curve mandrels.[27] In April 2011, the Debtor utilized Benz Research's SolidWorks' models to prepare drawings for modified base and front curve mandrels and wax dispensers.[28]

During this timeframe, the Debtor also approached an individual from an outside company with the idea of purchasing mandrels through a third party from Benz Research. Specifically, the mandrels would be purchased under false pretenses for the purpose of allowing Ennovy to acquire Benz mandrels. The acquisition of Benz mandrels was of great significance because it would negate the lead time of six to eight weeks that it would otherwise take the Debtor to make new mandrels. The Debtor specified in the email that he knew "that BRD has approx. 10,000 of each size in stock, so we could obtain a few hundred parts in a relatively short time frame."[29] In conclusion, the Debtor stated, "[t]his would alleviate some issues we're having with production since all of our mandrels need to be discarded due to being damaged, incorrect size, etc."[30]

On May 4, 2011, the Debtor recommended through a formal Production Process Improvement Memo (the "Memo") that Ennovy *adopt* Benz Research's base curve mandrels,

---

[25] (Doc. 172-1, Tr. pp. 283-285; p. 317; Doc. 172-2, Tr. pp. 163-164; Doc. 172-4, Tr. p. 83).

[26] (Pl.'s Ex. 25); (Doc. 172-2, Tr. pp. 20-21; 123-126).

[27] The Debtor reiterated this proposal on March 24, 2011, April 10, 2011, April 20, 2011, and May 1, 2011. (Pl.'s Ex's. 21, 22, 24, and 27).

[28] Id.; see also (Doc. 172-2 pp. 111-114, 131-136).

[29] (Pl's Ex. 16).

[30] Id.; The Debtor also cc'd an Ennovy executive on the email exchange. (Pl.'s Ex. 16).

as well as its static collet assembly and tabletop wax dispenser. The Memo also had illustrations of the devices he obtained from Benz Research's SolidWorks' models, and the necessary components were ordered from long time vendors for Benz Research.[31]

Ultimately, the Debtor had all the necessary equipment operational less than ten (10) months after beginning his employment at Ennovy. This resulted in Ennovy significantly improving its manufacturing process in a very condensed timeframe.[32] The Debtor also benefited because he became eligible for a lucrative bonus which offered him 20% of the annual "net" savings[33] that Ennovy realized from the improvement in the manufacturing process.[34]

During the trial, counsel for Benz Research asked the Debtor, "I mean, the very first waxer that you made for Mark'-Ennovy, the dispenser, that was just a straight Benz waxer, right? Straight Benz waxer, it was a complete copy, correct?"[35] In response, the Debtor stated, "[t]he very first one, yes."[36]

The Debtor's employment with Ennovy lasted almost four years until he was terminated on December 19, 2014.[37]

Relations between the Debtor and his former employer quickly disintegrated in June 2011, when Benz Research sued the Debtor in state court for misappropriation of trade secrets. The heart of the allegations against the Debtor was that he "willfully and maliciously took 6,000 electronic files containing drawings of custom components for Benz Research's manufacturing

---

[31] (Pl.'s Ex. 28); (Doc. 172-2, Tr. pp. 147-159).

[32] (Doc. 172-3, Tr. pp. 11-18).

[33] The 20% bonus *only* applied to "the annual first year net savings" Ennovy realized during the Debtor's first year of employment. (Pl.'s Ex. 12, p. 1).

[34] (Pl.'s Ex. 12); (Doc. 172-2, Tr. pp. 12-20, 144-147).

[35] (Pl's Binder 7, pg. 160).

[36] Id.

[37] (Pl.'s Ex. 63).

equipment and then used those drawings to replicate components for his new employer, Ennovy Spain, allowing Ennovy Spain to drastically improve its manufacturing processes."[38]

As a result of the Debtor's alleged actions, the state court temporarily enjoined him from disseminating Benz Research's trade secrets and entered a preservation order which required certain evidence to be turned over to a receiver.[39] "Four years into the litigation, Benz Research asked the state court to sanction the Debtor for violating the state court's injunction and preservation order; withholding documents during discovery; fabricating and concealing evidence; and testifying falsely under oath in affidavits, court proceedings, depositions, and interrogatory answers."[40] After conducting a five-day evidentiary hearing, the state court determined that the Debtor committed the following misconduct:

(i) when the Debtor left Benz Research in 2011, he misappropriated numerous files from the company (including design drawings and specifications for various components used in Benz Research's manufacturing process);

(ii) the Debtor then used those files to design, order, or buy the same or similar components for his new employer;

(iii) after learning that Benz Research had sued him, the Debtor destroyed a CD containing the files he misappropriated from Benz Research and then deleted Benz Research design drawings that were on his personal laptop;

(iv) during discovery, the Debtor fabricated and back-dated certain Ennovy Spain design drawings to hide the fact that he used stolen Benz Research design drawings to design and order components for Ennovy;

(v) in an affidavit filed in support of a motion to dismiss, the Debtor falsely testified that he had not misappropriated any Benz Research design drawings and that he had not ordered parts from certain suppliers;

---

[38] (Doc. 57, pp. 3-4).

[39] (Doc. 57, p. 3).

[40] (Doc. 57, p. 3).

    (vi)    in interrogatory answers, the Debtor lied about his attempts to buy parts that had been custom made for Benz Research and, to hide those attempts, failed to disclose vendors he bought parts from;

    (vii)    and before Benz Research inspected Ennovy Spain's manufacturing facilities during discovery, the Debtor removed from Ennovy Spain's equipment components that were based on Benz Research's designs.[41]

As stated previously, the sole matters before the Court for its determination are "whether the Debtor (1) took Benz Research's trade secrets with the intent to convert them or deprive Benz Research of them; or (2) intended to injure Benz Research by misappropriating its trade secrets or engaging in litigation misconduct."[42]

## **Discussion**

> Privacy is relational. It depends on the audience. You don't want your employer to know you're job hunting. You don't spill all about your love life to your mom or your kids. *You don't tell trade secrets to your rivals.* Barton Gellman.

### A.  11 U.S.C. § 523(a)(4)

"While the fundamental goal of the Bankruptcy Code is to provide the honest debtor with a fresh start, such a policy must be tempered by the need to prevent dishonest debtors from using the law as a shield." In re Hill, No. 3:20-AP-114-JAF, 2021 WL 4515245, at *4 (Bankr. M.D. Fla. Sept. 30, 2021). "Exceptions to discharge are construed strictly against creditors and liberally in favor of honest debtors." Id., see also St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 680 (11th Cir. 1993).

Pursuant to 11 U.S.C. Section 523(a)(4), there is a discharge exception for debts obtained "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[3]

---

[41] (Doc. 12-2, Ex. 2, Order on Pl.'s Mot. to Enforce Ct. Orders & for Contempt Sanctions), (Doc. 57, pp. 3-4).

[42] (Doc. 57, p. 2).

"Larceny or embezzlement need not be in a fiduciary capacity to be nondischargeable; ordinary larceny or embezzlement will suffice." In re Gross, 639 B.R. 255, 259–60 (Bankr. N.D. Ga. 2022). Larceny is "a felonious taking of property with the intent to convert it or to permanently deprive the owner of it." Burke v. Riddle (In re Riddle), 2011 WL 2461896, *4 (Bankr. N.D. Ga. Apr. 6, 2011) (citation omitted). "Embezzlement is the 'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" Ga. Dep't Human Servs. v. Ngwangu (In re Ngwangu), 529 B.R. 358, 365 (Bankr. N.D. Ga. 2015) (quoting Fernandez v. Havana Gardens, LLC, 562 F. App'x. 854, 856 (11th Cir. 2014)); see also In re Hill, No. 3:20-AP-114-JAF, 2021 WL 4515245, at *6 (Bankr. M.D. Fla. Sept. 30, 2021) (internal citations omitted). To support a claim for embezzlement specific elements must be shown, which include: "'(i) property owned by another is rightfully in the possession of the debtor; (ii) the debtor appropriates the property for personal use; and (iii) the appropriation occurred with fraudulent intent or by deceit.'" Gross, supra, quoting Hot Shot Kids Inc. v. Pervis (In re Pervis), 512 B.R. 348, 382-83 (Bankr. N.D. Ga. 2014); see also In re Queen, No. 21-11003-PMB, 2023 WL 2751228, at *5 (Bankr. N.D. Ga. Mar. 31, 2023).

"The primary difference between larceny and embezzlement is that with larceny, the debtor wrongfully takes the property from someone else, while with embezzlement, the debtor has rightfully come into possession of the property but wrongfully appropriates it for his own use." Gross, 639 B.R. at 260; see also In re Knight, 621 B.R. 529, 537 (Bankr. N.D. Ga. 2020). The Court finds embezzlement, rather than larceny, is the accurate analysis here because the Debtor, as an employee of Benz Research, rightfully came into and was entrusted with the possession of Benz Research's Property (design files, the mandrel, collet, and wax dispenser). Thereafter, the Debtor misappropriated the property for his own use during his subsequent employment

with Ennovy.[43] The remaining factor for the Court to consider is whether the misappropriation of Benz Research's Property was carried out by the Debtor with fraudulent intent or deceit.

"'An intent to defraud is defined as 'an intention to deceive another person, and to induce such other person, in reliance upon such deception to assume, create, transfer, alter or terminate a right, obligation or power with reference to property.'" In re Trexler, No. 14-52495-WLH, 2016 WL 236054, at *8 (Bankr. N.D. Ga. Jan. 11, 2016) (quoting Sandalon v. Cook (In re Cook), 141 B.R. 777, 781 (Bankr. M.D. Ga. 1992)) (citations omitted). A court should thoroughly assess all the events that have transpired and focus its analysis on the fact that "'[i]t is knowledge that the use is devoid of authorization, scienter for short…that makes the conversion fraudulent and thus embezzlement.'" Gross, supra, 639 B.R. at 260, quoting Lenox Pines, LLC v. Smith (In re Smith), 2021 WL 1234245, *10 (Bankr. N.D. Ga. Mar. 31, 2021). "Concealment may furnish evidence of fraudulent intent, and an intent to repay funds converted is not a defense." In re Queen, 2023 WL 2751228, at *5; Trexler, supra, at *8, citing Cook, supra, 141 B.R. at 783-84.

"It is the rare case in which a party will admit to fraudulent intent. Thus, it is well settled that a plaintiff may prove fraudulent intent by circumstantial evidence and consideration of the totality of the circumstances." In re Bell, 498 B.R. 463, 483 (Bankr. E.D. Pa. 2013). Notably, "fraudulent intent may be inferred from a course of conduct such as a 'pattern of concealment and nondisclosure.'" Cadle Co. v. Zofko, 380 B.R. 375, 383 (W.D. Pa. 2007) (quoting In re Dolata, 306 B.R. 97, 149 (Bankr. W.D. Pa. 2004)); see also In re Queen, 2023 WL 2751228, at *5; In re Marshall, 623 B.R. 123, 136–37 (Bankr. E.D. Pa. 2020). As recognized by the Eleventh Circuit, a finding of fraudulent intent "depends largely on an assessment of the

---

[43] (Doc. 12-2, Ex. 2, Order on Pl.'s Mot. to Enforce Ct. Orders & for Contempt Sanctions), (Doc. 57, pp. 3-4).

11

credibility and demeanor of the debtor." Fernandez, 562 Fed. Appx. at 856. The litany of events that occurred in this matter is brimming with circumstantial evidence, as well as acknowledgments made by the Debtor, which lead the Court to the inescapable conclusion that the Debtor acted with fraudulent intent at the time he misappropriated Benz Research's Property.

While still employed by Benz Research, the Debtor traveled to Europe twice for the purpose of meeting with Ennovy executives and touring Ennovy's factory in Madrid, Spain. During his first trip in January 2011, the Debtor was informed by Ennovy executives of the company's lathing problems, high rejection rates, and need for process improvement.[44] It was during this initial trip that the Debtor recognized Ennovy's system was outdated.[45] During the Debtor's second trip in early February 2011, he personally observed the problems with Ennovy's blank to collet system, which led him to characterize the high rejection rate as a "desperate production system," and recognized that Ennovy "needed an overhaul of their manufacturing process just to keep up with the demand."[46] Soon after returning from his second trip abroad, the Debtor tendered his letter of resignation to Benz Research on February 15, 2011.[47] Merely two weeks after resigning, the Debtor officially became an Ennovy employee, relocated to Spain, and began work on March 1, 2011.[48]

As previously determined by the state court, "when the Debtor left Benz Research in 2011, he misappropriated numerous files from the company (including design drawings and

---

[44] (Doc. 172-1, Tr. pp. 333-341).

[45] (Doc. 172-1, Tr. pp. 193, 200-214, 311, 354-373; Doc. 172-2, Tr. p. 11).

[46] (Doc. 172-2, Tr. pp. 102-103, 106).

[47] (Pl's Ex. 13).

[48] (Doc. 146, p. 2).

specifications for various components used in Benz Research's manufacturing process)"; and the Debtor then proceeded to use "those files to design, order, or buy the same or similar components for his new employer."[49] Specifically, the Debtor brought to Ennovy, base and front curve mandrels from Benz Research, a CD-ROM with BRD's SolidWorks models for its front and base curve mandrels, pneumatic and tabletop dispensers, and static collet assembly.[50] Without authorization, the Debtor then proceeded to *directly copy* these models from Benz Research's computer.[51] Soon after commencing employment with Ennovy, the Debtor deliberately transferred these models to his Ennovy laptop, and the files were later uploaded to Ennovy's server.[52]

The timing of events is particularly problematic for the Debtor. The Debtor acknowledges that his first order of business in his new engineering position at Ennovy was to replace the outdated blank to collet system with base curve mandrels.[53] As the evidence reflects, to achieve this goal the Debtor utilized Benz Research's SolidWorks' models to prepare drawings for modified base and front curve mandrels and wax dispensers. Barely two months into his employment, on May 4, 2011, the Debtor recommended through a formal Memo that Ennovy "adopt" Benz Research's base curve mandrels as well as its static collet assembly and tabletop wax dispenser.[54] The Debtor also made the ill-advised decision to flagrantly include illustrations in the Memo of the devices that he obtained from Benz Research's Solid Works'

---

[49] (Doc. 12-2, Ex. 2, Order on Pl.'s Mot. to Enforce Ct. Orders & for Contempt Sanctions), (Doc. 57, p. 3).

[50] (Pl's Ex. 59 at p. 6); (Doc. 172-1, Tr. pp. 278-283; Doc. 172-2, Tr. pp. 96-97; Doc. 172-4, Tr. p. 143).

[51] (Doc. 172-1, Tr. pp. 283-285; p. 317; Doc. 172-2, Tr. pp. 163-164; Doc. 172-4, Tr. p. 83).

[52] Id.

[53] (Doc. 172-1, Tr. pp. 304-307, 310-311; Doc. 172-4, Tr. pp. 25-28).

[54] (Pl's Ex. 28); (Doc. 172-2, Tr. pp. 147-159).

models.[55] Additionally, the Debtor ordered the necessary components from companies who were long time vendors for Benz Research.[56] The "net" result of the Debtor's misappropriations was that *less than* ten (10) months after beginning his employment at Ennovy, the Debtor had all the necessary equipment operational, which allowed Ennovy to significantly improve its manufacturing process in a very condensed timeframe.[57] The Debtor acknowledged during the trial that the use of Benz Research's various components contributed to significant cost savings for Ennovy.[58]

During the trial, the Court had the opportunity to observe the Debtor through four days of extensive testimony. Through the Debtor's testimony, it became evident that he is a very accomplished engineer. It also became apparent to the Court that the Debtor had a strong incentive to misappropriate Benz Research's technology because of the lucrative bonus Ennovy offered to him during his first year of employment. Specifically, the Debtor's employment agreement provided that he would receive 20% of any net savings he achieved for the company during his *first year* of employment.[59] Therefore, the Debtor was faced with a stringent timetable, which ultimately led to the misappropriations detailed above. The misappropriations were so blatant, that there is no explanation that is justifiable, no less believable. The Debtor seemingly acknowledged that at least some of his decisions negatively compounded this matter, and that if he could go back in time he would do things differently but that is irrelevant to the

---

[55] Id.

[56] The Debtor ordered components from Menschen and Associates, a Florida machine shop and longtime Benz Research vendor, as well as a machine shop in the UK, Loadpoint Bearings, Ltd., which custom-made static collet assemblies for Benz Research since 2005. (Pl.'s Exs. 30-34, 39-44, 52; Doc. 172-2, Tr. pp. 239-261).

[57] The jury in the state court case found that Ennovy benefited almost 5 million dollars from the unauthorized use of Benz Research's trade secrets. (Doc. 172-3, p. 18).

[58] (Doc. 172-3, p. 11).

[59] (Pl.'s Ex. 12).

Court's analysis. The issue before the Court is whether the misappropriation of Benz Research's Property was *carried out* by the Debtor with fraudulent intent or deceit. For the reasons discussed above, the Court answers this question in the affirmative. Therefore, the debt owed by the Debtor to Benz Research is excepted from his discharge pursuant to § 523(a)(4).

### B. 11 U.S.C. § 523(a)(6)

Although the Court has already determined that the debt to Benz Research will be excepted from discharge under § 523(a)(4), the Court will still consider whether the debt should also be excepted under § 523(a)(6).

The Eleventh Circuit has held that proof of "willfulness" requires "'a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another.'" In re Walker, 48 F.3d 1161, 1163 (11th Cir. 1995) (quoting In re Ikner, 883 F.2d 986, 991 (11th Cir. 1989)). "[A] debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." Id. at 1165; see also Kawaauhau v. Geiger, 523 U.S. 57, 61–62, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998) (holding that § 523(a)(6) requires the actor to intend the injury, not just the act that leads to the injury).

Recklessly or negligently inflicted injuries are not excepted from discharge under § 523(a)(6). In re Jennings, 670 F.3d 1329, 1334 (11th Cir. 2012), see also, Kawaauhau, 523 U.S. at 64. "Malicious" means "'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" In re Walker, 48 F.3d at 1164 (quoting In re Ikner, 883 F.2d at 991)). To establish malice, "a showing of specific intent to harm another is not necessary." In re Ikner, 883 F.2d at 991. "Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice." Id.

The record is replete with instances in which the Debtor acted wrongfully and without just cause or excessively. As previously discussed, the Debtor accepted the job knowing that Ennovy "needed an overhaul of their manufacturing process just to keep up with the demand."[60] Further, the state court already determined that the Debtor misappropriated numerous files from Benz Research and proceeded to use "those files to design, order, or buy the same or similar components for his new employer."[61] This included the Debtor directly copying the models from Benz Research's computer, deliberately transferring those models to his Ennovy laptop, and uploading the models to Ennovy's server.[62] If these actions were not already wrongful and excessive enough, merely two months into his employment, the Debtor recommended through a formal memo that Ennovy "adopt" various devices from Benz Research and included illustrations of the devices that were obtained directly from Benz Research's Solid Works models.[63] It is indisputable that the Debtor engaged in these actions without the knowledge or consent of Benz Research, and that his actions were in clear violation of his employment agreement with Benz Research. Tellingly, upon learning that Benz Research was suing him, the Debtor destroyed a CD containing files he misappropriated from Benz Research, and then deleted Benz Research design drawings from his personal laptop.[64] It defies logic for the Court to believe that an engineer as bright and accomplished as the Debtor is did not understand the severe implications of his actions. The Debtor knew the models were confidential and

---

[60] (Doc. 172-1, Tr. pp. 102- 103, 106).

[61] (Doc. 12-2, Ex. 2, Order on Pl.'s Mot. to Enforce Ct. Orders & for Contempt Sanctions), (Doc. 57, pp. 3-4).

[62] (Doc. 172-1, Tr. pp. 283-285; p. 317; Doc. 172-2, Tr. pp. 163-164; Doc. 172-4, Tr. p. 83.

[63] (Ex. 28); (Doc. 172-2, Tr. pp. 147-159).

[64] (Tr. 172-3, Tr. pp. 49-53, 56-57).

proprietary to Benz Research and were entrusted to him *solely* for the benefit of Benz Research. Despite this, the Debtor willfully took the models without the knowledge and consent of Benz Research and proceeded to misappropriate the models for the benefit of his new employer, Ennovy.[65] This evidence illustrates that the Debtor acted willfully because he knew he had no just cause to misappropriate the confidential and proprietary models of Benz Research. Moreover, there is no legitimate reason for the Debtor's misappropriation of the models. The Debtor acted solely in his own self interest so that he could ultimately be unjustly enriched by receiving 20% of the net savings achieved for Ennovy during his first year of employment. Based upon the above, the Court finds the Debtor acted with malice. Therefore, the debt owed by the Debtor to Benz Research will be excepted from discharge under § 523(a)(6).

C. **Setoff and/or Offset; Breach of Employment Contract; and Equity**

As a final matter, the Court will address the Debtor's arguments as to (i) setoff and/or offset, (ii) breach of employment contract, and (iii) equity.

The Court first considers the Debtor's assertion that because the "settlement agreement between BRD and the State Court co-defendants is amorphous; there is no clear delineation in the language of the settlement agreement itself indicating that it settled counts solely directed against the co-defendants and not against [the Debtor]," that the "entirety of the settlement amount must be offset or set-off against any judgment against [the Debtor]."[66]

Upon review, the Court finds that to the extent there are setoffs or offsets, the state court is the correct forum in which to handle such matters. This Court's review and analysis of the

---

[65] The Debtor's actions of purposefully hiding Benz Research's wax dispensers and replacing them with modified wax dispensers, during a 2014 site inspection conducted by Benz Research of Ennovy's Madrid factory, are illustrative of the Debtor's state of mind and knowledge that he had engaged in willful misappropriation of Benz Research's property. (Doc. 172-3, Tr. pp. 161-170).

[66] (Doc. 178, p. 16).

matter stops at the determination that the debt owed by the Debtor to Benz Research will be excepted from discharge under §523(a)(4) and (a)(6).  In re Sullivan, 58 B.R. 692, 699 (Bankr. D. Mass. 1986).

Second, the Debtor's argument that the Court "must distinguish between damages for the breach of contract, which are dischargeable, and those resulting from willful and malicious injury or larceny which would not be dischargeable" likewise fails.  As accurately asserted by Benz Research, the breach of contract in this Proceeding arose from the willful and malicious injury to Benz Research because of the Debtor's misappropriation of their trade secrets.  If the Debtor had not committed embezzlement, the breach of contract claim would not have arisen.  Accordingly, the Court finds that the breach of contract is inextricably tied to the willful and malicious misappropriation of trade secrets and should not be discharged.  In re Barreto, 514 B.R. 702, 717 (Bankr. S.D. Fla. 2013), aff'd, No. 13-81079-CIV, 2014 WL 3928518 (S.D. Fla. Aug. 12, 2014) (finding that because "the breach of contract claim was accompanied by the willful and malicious conduct required for a finding of nondischargeability under § 523(a)(6). An allocation of the damages to each segment of the judgment is unnecessary because all of the damages are nondischargeable.").

The Court also declines to exercise its powers under 11 U.S.C. § 105(a), to modify the nondischargeable debt under its equitable powers as it does not believe that is an appropriate use of § 105(a) under the facts and circumstances of this case.  The matter was extensively litigated in state court, over an inordinate period.  This Court's sole role is simply to determine the issue of dischargeability, and the Court will not wander outside of that narrow scope.

**CONCLUSION**

The Court concludes by recognizing what an exceptionally difficult and unfortunate saga this matter morphed into. While the Court understands its ruling is not the outcome the Debtor wants, the Court hopes that the finalization of the matter, at least in the bankruptcy court, will bring the Debtor one step closer to closing this unsettling chapter of his life and moving on. The Debtor is an accomplished engineer, and while he certainly made a series of unfortunate decisions, those ill-fated decisions will hopefully not define him moving forward.

Consistent with these Findings of Fact and Conclusions of Law, the Court will enter a separate judgement which provides that the debt owed by the Debtor to Benz Research is nondischargeable under 11 U.S.C. § 523(a)(4) and § 523(a)(6).